42 F.3d 1206
 RESOLUTION TRUST CORPORATION, as Receiver for
Concord-Liberty Savings and Loan Association, a
Federal Savings and Loan Association,
Plaintiff-Appellee,
v.
BVS DEVELOPMENT, INC., a California Corporation, Defendant,
and
Wolfgang W. Wagner; and Charlotte Wagner, Defendants-Appellants.
RESOLUTION TRUST CORPORATION, as Receiver for
Concord-Liberty Savings and Loan Association, a
Federal Savings and Loan Association,
Plaintiff-Appellee,
v.
BVS DEVELOPMENT, INC., a California Corporation, Defendant,
and
Theodore W. Aronson, Defendant-Appellant.
RESOLUTION TRUST CORPORATION, as Receiver for
Concord-Liberty Savings and Loan Association, a
Federal Savings and Loan Association,
Plaintiff-Appellee,
v.
BVS DEVELOPMENT, INC., a California Corporation, Defendant,
and
GT Water Products, Defendant-Appellant.
 Nos. 93-15716, 93-15717 and 93-16050.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 4, 1994.
Decided Dec. 6, 1994.
 
 John S. Wall, Wall, Wall & Peake, Bakersfield, CA, for defendants-appellants Wolfgang and Charlotte Wagner; Larry Errea, Bakersfield, CA, for defendant-appellant Theodore W. Aronson; Stephen E. Anderson, Irvine, CA, for defendant-appellant GT Water Resources.
 Benjamin K. Riley, Cooley, Godward, Castro, Huddleson & Tatum, San Francisco, CA, for plaintiff-appellee.
 Appeal from the United States District Court for the Eastern District of California.
 Before: GOODWIN, O'SCANNLAIN, and KLEINFELD, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 Junior lienholders, GT Water Products, Inc. ("GT Water"), Theodore Aronson ("Aronson"), and Wolfgang and Charlotte Wagner ("Wagner") appeal summary judgment and order of foreclosure in favor of senior lienholder, the Resolution Trust Corporation as receiver for Concord-Liberty Savings and Loan Association ("RTC-Concord").
 
 
 2
 The appellants were the owners of land that was being acquired for development by a thinly capitalized company whose ultimate failure brought about this litigation. The owners each sold their land for a cash payment and notes secured by a deed of trust. Concord provided construction financing and demanded subordination of existing notes and trust deeds to its trust deed. When the venture failed, the interests of the junior lienholders were substantially wiped out.
 
 
 3
 The three principal issues on appeal are whether: (1) removal of the case to federal court pursuant to the RTC's removal power under 12 U.S.C. Sec. 1441a was lawful after the litigation had gone to judgment and was on appeal in the state court; (2) the D'Oench doctrine as codified in 12 U.S.C. Sec. 1823(e), which invalidates agreements not found in a financial institution's written records when the RTC enters as receiver for that institution, barred appellants' defenses of negligence and breach of fiduciary duty to RTC-Concord's foreclosure; and (3) the trial court erred in failing to grant a continuance of the summary judgment motion pursuant to California Code of Civil Procedure Sec. 437c to permit more discovery where one junior lienholder claimed that documents establishing a redemption and release of encumbered property may exist and another alleged that evidence of a conspiracy between the lender and developer may exist. We now affirm.
 
 I. FACTS AND PROCEDURAL BACKGROUND
 
 4
 On December 15, 1989, RTC-Concord was appointed as receiver to liquidate the assets of Concord. In 1985, Windtree Mortgage Co. ("Windtree"), a subsidiary of Concord, had loaned $2.6 million to BVS Development, Inc. ("BVS") to finance the building of a subdivision known as the Rosamond Skypark, a planned "fly-in" residential development, consisting of sixty residential and two commercial lots. In exchange for the construction loan, BVS executed a note secured by a first deed of trust against the entire development.
 
 
 5
 BVS had purchased the property from the appellants for cash and separate promissory notes secured by a single first deed of trust on the entire tract in the amount of $1,294,000. (GT Water's interest in the case arises from its later acquisition of one of these notes). As secured sellers, the owners subordinated their security interest to the trust deed in favor of Concord. Later in 1985, BVS obtained another loan from Antelope Valley Savings & Loan ("Antelope") for $3.5 million. The noteholders again subordinated their deeds of trust, taking a third position behind Concord and Antelope. In 1986, BVS and Windtree entered into a Modification Agreement whereby the maturity date of the loan was extended by five months. In 1988, BVS obtained still another loan from Antelope, and the noteholders again subordinated, remaining in a position of third priority.
 
 
 6
 In 1986, BVS defaulted on the $2.6 million loan, leaving a principal balance of $1.73 million. At the time of default, encumbered by RTC-Concord's Deed of Trust were the commercial lots, against which RTC-Concord was the senior lienholder, and thirty-two residential lots against which RTC-Concord's lien was junior to the lien of the Resolution Trust Corporation as conservator for HomeFed Bank ("RTC-HomeFed"). (HomeFed succeeded to Antelope's interest upon their merger in 1990. RTC-HomeFed became successor-in-interest to Antelope in 1992, upon RTC's appointment as conservator for HomeFed.)
 
 
 7
 RTC-Concord sued in the Kern County Superior Court to foreclose its first trust deed and enforce its guaranties. On January 9, 1992, RTC-Concord moved for summary judgment on all claims between it and the other parties. Wagner and GT Water requested a continuance of the motion to permit further discovery. GT Water claimed that with more time for discovery it could prove that it had paid $100,000 for a release from the senior lien of one of the commercial lots. The superior court held that the motion for a continuance and all the affirmative defenses and cross claims of the junior lien claimants were premised upon oral, secret, or other unwritten agreements and therefore barred by 12 U.S.C. Sec. 1823(e) as precursed in D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).
 
 
 8
 The superior court then found that the following facts were established and not materially disputed: (1) a current obligation owed to RTC-Concord in the amount of $2.9 million including principal and interest; (2) a deed of trust securing the obligation; (3) the priority interest of RTC-Concord and RTC-HomeFed in the security; and (4) default on the obligation. Accordingly, the court granted summary judgment.
 
 
 9
 In denying GT Water's request for a continuance, the court had decided not only that D'Oench would bar the use of any documents found that were not part of the bank's written record, but that even if GT Water were able to overcome the D'Oench doctrine's application, under the terms of the loan, no valid release could have been executed because the loan was in default at the time of the alleged release. The loan agreement specifically precludes piecemeal release of collateral when the loan is not current.
 
 
 10
 The decree granted RTC-Concord the right to foreclose judicially and established the liability of BVS and the guarantors for any deficiency after the sale of the security. On September 18, 1992, Aronson, GT Water and Wagner filed in the state court separate Notices of Appeal from the decree. While that appeal was pending in state court, RTC-HomeFed removed the consolidated Kern County Superior Court suit to the District Court for the Eastern District of California on October 2, 1992 pursuant to the RTC removal power defined in 12 U.S.C. Sec. 1441a. On November 30, 1992, the district court denied the motions of Aronson and Wagner to remand back to the state court.
 
 
 11
 On March 15, 1993, the district court adopted the Kern County Superior Court decree as its own and entered the state judgment as its final judgment on March 16, 1993. This appeal followed.
 
 
 12
 II. REMOVAL JURISDICTION UNDER 12 U.S.C. Sec. 1441a(l )(3)
 
 
 13
 a. Removal of a State Court Case on Appeal
 
 
 14
 GT Water asserts that the district court erred in failing to remand the action back to state court; and RTC-Concord asserts that GT Water has waived any right to challenge the refusal to remand by failing to move for remand within thirty days of removal, the time limit established by 28 U.S.C. Sec. 1447(c), and by failing to join the three remand motions of the other appellants.
 
 
 15
 We note that Sec. 1447(c) applies only to remand motions which challenge removal procedure. Under its express terms, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. Sec. 1447(c). This Court held in Hellon & Assocs., Inc. v. Phoenix Resort Corp., 958 F.2d 295, 297 (9th Cir.1992), "Removal of cases from the state courts to the federal court raises questions of subject matter jurisdiction we review de novo." So, Sec. 1447(c) poses no bar to this jurisdictional challenge of removal to federal court.
 
 
 16
 In F.D.I.C. v. Letterman Bros., 980 F.2d 1298, 1300 (9th Cir.1992), this Court, noting the question whether removal to the district court was proper, expressly reserved judgment on the question whether removal is proper after a state court has entered judgment. We now hold that the RTC can remove a case from state court, even after judgment has been entered there and an appeal in state court is pending, provided that removal is otherwise proper. In so ruling, we join the courts of appeal for seven circuits that have already ruled on this issue with regard to the RTC's or the FDIC's removal powers. These courts have unanimously held that the statutes permit removal after a state trial court has entered a judgment and the time for relief in the state trial court or in federal court under Fed.R.Civ.P. 60 has passed.
 
 
 17
 The Court of Appeals for the First, Third, Fourth, Fifth, Seventh, Eighth and Eleventh Circuits have all held that the FDIC's Sec. 1819 or the RTC's Sec. 1441a removal powers extend to cases pending appeal. See cases interpreting Sec. 1441a to permit removal of cases pending appeal, Ward v. Resolution Trust Corp., 901 F.2d 694 (8th Cir.1990); In re 5300 Memorial Investors, Ltd., 973 F.2d 1160, 1163 (5th Cir.1992); Lester v. Resolution Trust Corp., 994 F.2d 1247, 1252 (7th Cir.1993); Resolution Trust Corp. v. Nernberg, 3 F.3d 62, 67 (3d Cir.1993); and Resolution Trust Corp. v. Allen, 16 F.3d 568, 572 n. 4 (4th Cir.1994). See cases interpreting Sec. 1819 to permit the FDIC to remove cases pending appeal in state courts, F.D.I.C. v. Keating, 12 F.3d 314, 316 (1st Cir.1993); In re Savers Federal Sav. & Loan Ass'n, 872 F.2d 963, 966 (11th Cir.1989) (interpreting Sec. 1730(k)(1), the predecessor to Sec. 1819); and In re Meyerland Co., 960 F.2d 512 (5th Cir.1992). Lastly, see also, Jackson v. American Sav. Mortg. Corp., 924 F.2d 195, 197-198 (11th Cir.1991) (extending the logic of In re Savers to permit the FSLIC to remove an action that had already been appealed to the state supreme court).
 
 
 18
 b. The Case or Controversy Requirement
 
 
 19
 GT Water also argues that the Article III limitation of federal jurisdiction to "cases" and "controversies" prohibits a district court from entering a state court judgment as its own. This argument finds authority only in the dissent in Meyerland, 960 F.2d supra at 524. We reject it.
 
 
 20
 The terms "cases" and "controversies" in Section 2 of Article III define the "judicial Power," the permissible bounds of federal jurisdiction as a whole. Article III does not make distinctions among the "inferior courts" to be established by Congress or require the "judicial Power" to be divided among those courts in any particular way. Because Article III is concerned with the scope of federal jurisdiction as a whole, it is only concerned with whether a "case" or "controversy" is presented to the federal judiciary as a whole. It is of no constitutional significance if in a particular instance a district court is required to perform the ministerial task of entering judgment based on an already entered state judgment, as a condition of our exercise of appellate jurisdiction.
 
 
 21
 GT Water errs in equating the unfamiliar with the impermissible. Though the RTC removal provision may require the district courts to act in unaccustomed ways, inconsistent with the ordinary course of federal litigation, there is no constitutional prohibition against novelty.
 
 
 22
 Further, adoption of state court judgments on removal is not novel. It is settled that a federal court must take a case as it finds it on removal, requiring a district court to treat a prior state judgment "as though it had been validly rendered in [a] federal proceeding." Butner v. Neustadter, 324 F.2d 783, 786 (9th Cir.1963). See also, Edna H. Pagel, Inc. v. Teamsters Local Union 595, 667 F.2d 1275 (9th Cir.1982) and Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County, 415 U.S. 423, 435-36, 94 S.Ct. 1113, 1122, 39 L.Ed.2d 435 (1974).
 
 
 23
 Title 12 U.S.C. Sec. 1441a(l ), added by Section 501 of the Financial Institution's Reform, Recovery and Enforcement Act ("FIRREA"), provides in relevant part:
 
 
 24
 (1) Notwithstanding any other provision of law, any civil action, suit, or proceeding to which the Corporation is a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction over such action, suit, or proceeding.
 
 
 25
 . . . . .
 
 
 26
 (3)(A) The Corporation, in any capacity and without bond or security, may remove any action, suit, or proceeding from a State court to the United States district court with jurisdiction over the place where the action, suit, or proceeding is pending ...
 
 
 27
 (i) not later than 90 days after the date the Corporation is substituted as a party ...
 
 
 28
 The briefs of both GT Water and RTC-Concord mistakenly argue that 12 U.S.C. Sec. 1819(b)(2)(B) which creates a parallel removal power in the FDIC is at issue here. In fact, the RTC removed pursuant to the removal power granted to it by Sec. 1441a. This error, however, does not materially affect the arguments presented in the briefs or the relevant case law. Due to the similarity of the operative language in both provisions, the similar aims and purposes of the savings and loan legislation which created each (FIRREA and the Federal Home Loan Bank Act respectively), and the similar functions of both the RTC and the FDIC, its parent institution, courts have generally regarded the decisional authority under one as binding, or at least, heavily influential, on the other. See, In re 5300 Investors, LTD., 973 F.2d 1160 (5th Cir.1992) (extending the Fifth Circuit's interpretation of Sec. 1819 to Sec. 1441a to permit the RTC to remove to federal court after state court of appeals had ruled).
 
 
 29
 The opinions in In re Meyerland Co., 960 F.2d 512 (5th Cir.1992) are the most thorough and cogent exposition of the competing views on this issue. Most of the sources of ambiguity pointed out by the Meyerland dissenters have been removed by subtle, but significant differences in the language of the early version of Sec. 1819 reviewed by the Meyerland court and the current language of Sec. 1441a before this court.
 
 
 30
 The RTC removal provision, unlike the statute at issue in Meyerland, does not rely upon the timing and venue provisions of the general removal scheme. Title 12 U.S.C. Sec. 1441a has its own venue and timing provisions and does not even implicitly reference the provisions of 28 U.S.C. Sec. 1441 et seq.
 
 
 31
 It is true that the RTC removal provision does not include independent procedures for removal. The RTC removal power must incorporate by implicit reference the mechanical provisions of the general removal scheme, such as procedures for notice of removal to the district court, for opposition thereto, and for stay of the state court proceedings, in order to operate. Ninth Circuit precedent, however, makes clear that 12 U.S.C. Sec. 1441a creates an independent power of removal, distinct from the general removal provision of 28 U.S.C. Sec. 1441 et seq. In Hellon & Associates, Inc. v. Phoenix Resort Corp., 958 F.2d 295, 299 (9th Cir.1992), this Court held that 12 U.S.C. Sec. 1441a is not the exclusive means by which the RTC may remove to federal court. By holding that proper removal under the general removal provision alleviates the need to meet the requirements of the special RTC removal provision, this Court necessarily also held that the two are wholly distinct modes of removal. Id. More recently, this Court has reaffirmed the implicit holding of Hellon, stating in dicta, "Congress, which has the absolute right to confer removal jurisdiction as long as federal jurisdiction is within constitutional limits, has specifically exempted the RTC from the ordinary removal scheme." People of State of Cal. v. Keating, 986 F.2d 346, 348-49 (9th Cir.1993).
 
 
 32
 To the extent any ambiguity remains, the purposes behind the statutory scheme, as expressed in the legislative history and evidenced by the other procedural advantages given to the RTC militate in favor of resolving any ambiguity in favor of permitting the RTC access to the federal courts. As this Court has said:
 
 
 33
 [S]ection 1441a(l )(3) gives the RTC greater removal authority than that available to others and takes no authority away. That is consistent with Congress' overall reaction to the savings and loan crisis the country faced when FIRREA was adopted.
 
 
 34
 Hellon & Associates, Inc. v. Phoenix Resort Corp., 958 F.2d at 298.
 
 
 35
 c. Procedural Problems of Removing Cases Pending Appeal
 
 
 36
 GT Water correctly points out the very serious procedural problems that may arise when cases pending appeal are removed. In determining whether a case pending appeal in state court is removable, a federal court must decide when a state judgment becomes final and is therefore, no longer subject to review. Even more troubling, removal of state cases pending appeal requires a division of responsibilities between the federal district and appellate courts and a determination of what opportunities to challenge the judgment are available in each. Because nothing turns on resolution of these issues in the present case, we save these procedural problems for another day. For now, we hold only that, on the particular facts of this case, the case was properly removed and brought before this Court.
 
 
 37
 III. SUMMARY JUDGMENT AND THE D'OENCH DOCTRINE
 
 
 38
 a. Standard of Review
 
 
 39
 To find a grant of summary judgment proper under California Code of Civil Procedure Sec. 437c, we must determine "that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Cal.Code Civ.Proc. Sec. 437c.
 
 
 40
 b. RTC-Concord Owed No Duty to Appellants
 
 
 41
 Appellants raised defenses to summary judgment based on theories of negligence, breach of good faith and fair dealing and breach of fiduciary duty arising out of Concord's failure to monitor adequately the ailing development or inform appellants of the mounting problems. The Wagners also discuss theories of concealment, constructive fraud and statutory violations in their brief. However, because none of these additional theories raised by the Wagners in their brief was raised in the trial court, these theories have been waived and need not be addressed here. Bolker v. Commissioner of Internal Revenue, 760 F.2d 1039, 1042 (9th Cir.1985).
 
 
 42
 As for the surviving theories, Concord expressly disclaimed any duty to supervise the construction or examine the books of the borrower in the loan agreement. The Building Agreement states at paragraph 6(c) of the borrower's covenants:
 
 
 43
 The Lender is under no duty to supervise or inspect construction or examine any books and records. Any inspection or examination by the Lender is for the sole purpose of protecting the Lender's security and preserving the Lender's rights under this Agreement. No default of the Borrower will be waived by any inspection by the Lender. In no event will any inspection by the Lender be a representation that there has been or will be compliance with the plans or specifications or that the construction is free from defective materials or workmanship.
 
 
 44
 Considering Concord's express disclaimer of any duty to oversee BVS for the benefit of anyone other than itself, the district court presumably reasoned that all the asserted defenses and theories of liability are based on oral understandings or secret agreements not in Concord's written records. When the RTC assumes control of a savings and loan, the D'Oench doctrine, as codified in 12 U.S.C. Sec. 1823(e), generally invalidates any rights based on alleged oral discussions or secret agreements that are not documented in the financial institution's records. D'Oench Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942); Murphy v. FDIC, 38 F.3d 1490 (9th Cir.1994). Accordingly, the state trial court held in its order granting summary judgment that the appellants' arguments are barred by D'Oench and therefore without merit as a matter of law. While we affirm the district court's ultimate decision, we need not reach any D'Oench question, because RTC-Concord simply owed no duty to the appellants.
 
 
 45
 Appellant Aronson argues that the allegations of negligence against Windtree based on loaning excess funds to BVS and allowing funds to be spent carelessly present a triable issue of fact. This court need not reach the issue whether negligence actions survive Sec. 1823(e), because there was an express disclaimer of any duty to inspect or otherwise protect the sellers. The loan agreement between Windtree and BVS expressly states that Windtree had no duty to manage or monitor BVS. If Windtree had no obligation, it had no duty to exercise any particular level of care in the performance of such an obligation.
 
 
 46
 Moreover, even if the loan agreement did not contain an express disclaimer of any oversight duties, under California law, a construction lender loaning money to a developer ordinarily owes no duty to subordinated sellers. Gill v. Mission Sav. & Loan Ass'n, 236 Cal.App.2d 753, 756-57, 46 Cal.Rptr. 456 (1965). Only under extraordinary circumstances in which a lender plays an instigating or active role in a development project will a duty to subordinated sellers be imposed. (See discussion below regarding whether the loan agreement constitutes a joint venture.) Because the loan in the present case was an ordinary construction loan and the loan agreement expressly disclaimed any oversight duties, Windtree, and through it RTC-Concord, owed no duty to Aronson. Thus, no action for negligence will lie.
 
 
 47
 The Wagners raise as defenses to RTC-Concord's recorded priority, breach of covenant of good faith and fair dealing and breach of fiduciary duty. The Wagners contend that a mutual enterprise or joint venture in which the Wagners provided the land, the bank provided the funds, and the developers provided the "know how" for the development was formed when the Wagners subordinated their lien. They argue that this mutual relationship gave rise to a fiduciary duty in which RTC Concord had to protect affirmatively the Wagners interests. Under California law, a lender does not owe a borrower or third party any duties beyond those expressed in the loan agreement, excepting those imposed due to special circumstance or a finding that a joint venture exists. Nymark v. Heart Fed. Sav. & Loan Ass'n., 231 Cal.App.3d 1089, 1096, 283 Cal.Rptr. 53 (1991). No such special relationship or joint venture exists here.
 
 
 48
 "A joint venture exists when there is an 'agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control.' " Connor v. Great Western Sav. & Loan Ass'n, 69 Cal.2d 850, 863, 73 Cal.Rptr. 369, 447 P.2d 609 (1968) quoting Holtz v. United Plumbing and Heating Co., 49 Cal.2d 501, 506-07, 319 P.2d 617) (citation omitted). In the present case, none of these characteristics is present. RTC-Concord has no interest in the profits and losses of the enterprise, nor does it have any right of joint control. RTC-Concord is merely a lender whose interest in the business extends only as far as its interest in timely repayment and the value of its security.
 
 
 49
 Furthermore, "[t]he law is well settled that rights of priority under an agreement of subordination extend to and are limited strictly by the express terms and conditions of the agreement." Miller v. Citizens Sav. & Loan Ass'n, 248 Cal.App.2d 655, 663, 56 Cal.Rptr. 844 (1967). The Deed of Trust executed by the Wagners in the present case does not place any conditions on subordination, so there are no grounds for upsetting the express priorities.
 
 
 50
 Appellants' contention that the duties a lender owes to a subordinated seller arise outside of the written contract and are imposed by public policy simply misinterprets the case law. The duty of a lender to supervise the use of loan funds arises only from a written agreement to do so, or perhaps from the knowledge that the seller is relying on such monitoring and the lender does not disclaim such reliance or the lender actively undertakes such a role. Because there is no duty on the bank implied in law, and because the written agreements disclaim any implied duty, the appellants' arguments must fail.
 
 
 51
 c. Other Meritless Claims
 
 
 52
 Aronson asserts numerous theories which he contends are not voided by D'Oench. If they are not voided by D'Oench, the reasoning goes, appellants have a surviving basis for relief and summary judgment was inappropriate. Appellants may be correct in that the following theories may be beyond D'Oench's long reach. However, just because a theory is not voided by D'Oench, does not mean it has the merit to survive summary judgment. The claims for relief based on material modification of the loan agreement, the failure to mitigate damages, laches, and the existence of a modification contract are all substantially without merit, warranting a grant of summary judgment.
 
 
 53
 1. Material Modification of the Loan Agreement
 
 
 54
 Aronson contends that BVS and Windtree nullified Aronson's express subordination agreement when they extended the maturity date on the loan from June 1, 1986 to November 1, 1986. The detriment, if any, suffered by Aronson due to this loan extension is not of the type or degree sufficient to invalidate an existing subordination agreement.
 
 
 55
 Under California law, "a lender and a borrower may not bilaterally make a material modification in the loan to which the seller has subordinated, without the knowledge and consent of the seller to that modification, if the modification materially affects the seller's rights." Gluskin v. Atlantic Sav. & Loan Assn., 32 Cal.App.3d 307, 314, 108 Cal.Rptr. 318 (1973). Aronson argues that the five month extension of the BVS-Windtree loan, made without his knowledge or consent, materially and adversely affected his rights in two ways. First, Aronson asserts that because he was to be paid out of lot sale proceeds, and under the extension, Windtree received $5,000 more from each lot sale, the extension adversely affected his position. Second, Aronson points to the increased interest that he would owe Windtree on the five-month extension, if he were to foreclose his deed upon breach. Aronson argues on these two grounds that, at a minimum, the issue of whether he was materially affected presents a question of fact that makes summary judgment inappropriate.
 
 
 56
 The facts asserted by Aronson simply do not constitute the kind of degree of "material modification" the rule seeks to prevent. The rule articulated in Gluskin aims to protect subordinated sellers from secret agreements between buyers and lenders against the interest of the subordinated seller. Id. More specifically, the Gluskin court was concerned about modifications that materially increase the risk of default. Id. at 315. No such situation is presented here. The loan extension, if anything, delayed default another five months. The extension, rather than compromising an otherwise successful deal, gave the development a greater chance of turning itself around, thereby giving Aronson a greater chance of getting paid. To the extent Aronson can show any harm from the modification, it does not rise to a level that warrants dismantling the financial structure of the development scheme.
 
 
 57
 Furthermore, the extension of the loan by five months is too slight a modification to invoke the public policy concerns that moved the Gluskin court to reorder the express priorities. In Gluskin, the lender and buyer reduced the term of the loan from thirty years to ten months, increased the interest rate by 3.5 percent, drastically reduced the principal and monthly payments due under the loan, and added a large balloon payment at the end of the term. Id. at 312. In addition, the modification agreement in Gluskin contained no representation that anyone else had any interest in the security. Id. By contrast, the only modification here was the five-month extension.
 
 2. Failure to Mitigate Damages
 
 58
 Aronson also argues that summary judgment and foreclosure was improper because RTC-Concord failed to mitigate its damages by collecting rents from the commercial lots, as it was permitted to do under an assignment of rents clause in the BVS-Windtree deed of trust.
 
 
 59
 Any failure to mitigate goes to the amount of deficiency owed, not whether a deficiency exists. So, failure to mitigate is no defense to the grant of summary judgment and foreclosure, though it may be an appropriate issue to raise at the deficiency hearing when each party's exact interest in the security will be determined. See, United Cal. Bank v. Tijerina, 25 Cal.App.3d 963, 102 Cal.Rptr. 234 (1972) (ruling that Cal.Code Civ.Proc. Sec. 726 contemplates a two-stage proceeding, a foreclosure stage at which defenses to a right to a deficiency may be raised, and a deficiency hearing at which defenses to the amount of deficiency may be raised).
 
 3. Laches
 
 60
 Aronson's twelfth of twenty affirmative defenses is laches. Although this defense may still be available under the D'Oench doctrine, it is not available under the facts of this case. There is no evidence in the record that Aronson was prejudiced in any way by delay and prejudice is a necessary element of the laches defense. Getty v. Getty, 187 Cal.App.3d 1159, 1170, 232 Cal.Rptr. 603 (1986) (setting out the elements of laches).
 
 
 61
 4. Summary Judgment Must Dispose of Entire Case
 
 
 62
 Under California Code of Civil Procedure Sec. 437c(a), summary judgment may be granted only if it will completely dispose of a cause of action or defense. Aronson argues that because the purported material modification draws the priorities in question and the failure to mitigate raises questions over the amount of the deficiency, the summary judgment order here did not dispose of the entire cause of action. This contention is nothing more than a poorly-disguised rehash of the modification and mitigation theories addressed above.
 
 
 63
 IV. CONTINUANCE TO PERMIT FURTHER DISCOVERY UNDER CALIFORNIA CODE OF CIVIL PROCEDURE Sec. 437c
 
 
 64
 Both GT Water and Wagner argue that the trial court erred in denying their motions to continue RTC-Concord's summary judgment motion in order to permit further discovery. The denial of a continuance was proper in both cases, though for different reasons.
 
 
 65
 Continuance of a summary judgment motion is mandatory upon a good faith showing by affidavit that the continuance is needed to obtain facts essential to justify opposition to the motion. Nazar v. Rodeffer, 184 Cal.App.3d 546, 556-57, 229 Cal.Rptr. 209 (1986); Cal.Code Civ.Proc. Sec. 437c(h).[1]
 
 
 66
 Even under this lenient standard, denial of the Wagners' motion for a continuance was proper given that the Wagners did not submit an affidavit describing what facts they hoped to elicit by further discovery and how those facts were essential to justify opposition. No account, on appeal, of facts that might be found with more discovery can overcome the requirement that their opposition be supported by an affidavit in the trial court.
 
 
 67
 GT Water's argument is better grounded, but still fails. GT Water argued that further discovery was necessary to find documentation of the claimed loan modification or partial release or reconveyance of a commercial lot. The trial court correctly rejected this argument. The D'Oench doctrine, as codified in Sec. 1823, trumps evidence of any side agreement not found in the institution's records. GT Water had ample opportunity for discovery, and all it can point to in support of its claimed redemption and release are partially executed documents, apparently not signed by Concord, setting a release price on either of two parcels of $100,000, a GT Water payment of $100,000 to Concord, and a letter from Concord asking for copies of a reconveyance for review and approval, which the writer promised to handle immediately. "Scattered evidence in corporate records from which one could infer the existence of an agreement does not meet the requirements of the statute." Resolution Trust Corp. v. Midwest Fed. Sav. Bank of Minot, 36 F.3d 785 (9th Cir.1994). Here, no release was ever recorded and no reconveyance ever made to GT Water. Since there is no documentation in RTC-Concord's records, Sec. 1823 precludes a finding that a release and reconveyance agreement existed, whatever evidence further discovery may yield.
 
 
 68
 Indeed, GT Water's presumably honest, if inept, attempt to purchase the motel site free and clear presents a sympathetic story. GT Water had arguably built up a store of equities vis a vis Windtree and Concord through its correspondence and payment of $100,000 to Concord. However, under Sec. 1823, whatever equitable obligation Concord owed GT Water simply does not transfer to the RTC when it enters as receiver.
 
 
 69
 Appellants collectively assert several other unsubstantiated arguments that do not merit discussion. The unhappy truth is the land owners entered into an agreement to subordinate their security interests in land in reliance upon the expectation that the development scheme would prosper. Instead, the scheme collapsed in insolvency and the priority among creditors, agreed to by the parties, wiped out the subordinated, junior lienholders.
 
 V. CONCLUSION
 
 70
 Because it was within the RTC's power to remove to the district court and because all of appellants' arguments are either barred by D'Oench or fail on the merits, we AFFIRM.
 
 
 
 [1]
 The California Code of Civil Procedure Sec. 437c(h) provides:
 If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication or both that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make any other order as may be just.